OPINION OF THE COURT
David Goldstein, J.
This is a criminal proceeding, currently on trial before this court, on charges that, on August 10, 1990, defendant murdered his six-day-old son, Anthony, and then used a sharp instrument to dismember the body and feed the pieces to his dog. At issue now is whether one of the sworn jurors ought to be discharged from further service as "grossly unqualified” *922 and for "misconduct of a substantial nature,” within the terms expressed in CPL 270.35. This memorandum is to further supplement and explain the oral decision rendered from the Bench.
Jury selection began on September 17, 1992 and was completed September 24th, with 12 jurors and 4 alternates selected, the People having used 13 peremptory challenges and defendant 16, far less than the 20 challenges permitted to each. On September 30th, following intervening religious holidays, opening statements were heard and the People called their first witness. At the request of counsel, no court session was held on October 2,1992.
The issue as to the qualifications and misconduct of juror No. 12 was brought to the court’s attention, initially, by the first alternate, on October 1, 1992 and, thereafter, came to a head on Monday, October 5th, when 2 jurors and 2 alternates complained, some bitterly, that juror No. 12, who had been wearing the same shirt, pants and jacket, every day since the jury selection process began, emitted a foul body odor, making it unbearable to sit in the same room with him, either the courtroom or the jury room.
In addition, they complained that during the trial, while witnesses were on the stand, he repeatedly slapped his hands against his thighs in a distracting, disturbing and annoying fashion and mumbled or talked to himself out loud, over and over again, "Is he guilty or is he not guilty? — How am I supposed to know? — Who’s supposed to decide? — Is he guilty or is he not guilty?” and that this, if it continued in the future, could be distracting so as to interfere with their ability to hear and concentrate on the testimony from the witness stand.
The very same complaint was presented to the court on September 30, 1992, the first alternate having raised the matter with the court officer on the previous court date, September 24th, before the religious holiday recess. At that time, the court interviewed the alternate juror, on the record, with both counsel in attendance, and ascertained that the health complaint had apparently abated over the long weekend and, for the moment, he had stopped talking to himself.
In recognition that further persistence by the juror in talking out loud as to the guilt or innocence of the defendant could have disastrous and prejudicial consequences in terms of the right to a fair trial, it was agreed that, in addition to the *923 usual admonitions not to converse with anyone on any subject relating to the case, the court would instruct the jurors not to talk to themselves, out loud, about the case. Although the instruction sounded at the time as ridiculous as it appears on paper now, in my view, it was necessary as an initial curative step to correct a problem which could possibly lead to a mistrial in a homicide case expected to continue for over five weeks — one with graphic evidence by both sides as to whether the dismembered body parts were cut by a sharp instrument or by the dog, and one which both sides concededly do not wish to try twice.
As noted, the problem resurfaced on October 5th, when several jurors and alternates complained as to juror No. 12. As a result, the court and counsel interviewed each juror and alternate, on the record, in chambers, to ascertain the extent of the problem and which jurors were affected by the offensive health condition, the continual slapping and/or the talking, a procedure in which both counsel participated and which lasted most of the day.
As a result of the hearing, it was learned that jurors Nos. 10 and 11 (seated to the right, next to juror No. 12), the first three alternates (seated immediately to the left of juror No. 12), juror No. 4 (seated in front and to the right of juror No. 12) and alternate No. 4 (seated at the other side of the jury box), were all affected, in varying degrees, by one or more of the foregoing problems.
Some found his actions and talking annoying, indicating it could interfere with their ability to concentrate on the testimony and evidence to be adduced at trial. One mentioned that the talking and slapping persisted during the playing of the videotape of the autopsy of the dog, which led to comment by one juror that, as a result, they would have to see the tape again, during deliberations. The body odor was particularly disturbing to them, especially considering that they maintained close quarters and would be expected to do so for a protracted period. It was also said that the juror buried his face in his hands, rubbing it in a most distracting fashion. The court observed that his eyes were closed during the viewing of the autopsy. Another juror focused her complaint on juror No. 12’s strange and annoying conduct and offensive odor in the jury room, since she sat too far away from him to be affected in the courtroom. The remaining jurors (Nos. 1-3, 5, 6, 7 and 9) were not affected by nor did they notice the problems. *924 (Juror No. 8 was ill that day, was not interviewed and was subsequently excused on consent.)
After interviewing each juror and alternate, and affording counsel an opportunity to inquire, the court proceeded to question juror No. 12, in the courtroom, with defendant present. When defendant and his attorney waived defendant’s presence, to avoid any embarrassment from any examination in open court, it was agreed to continue in chambers, on the record, with all attorneys in attendance. Juror No. 12 flatly denied that he had been talking to himself out loud, or that he had been slapping his legs repeatedly, although when asked about the latter, he grabbed his trousers, clenching them with both fists to keep his hands still, and then rubbed the upper portion of both legs, over and over again, as the inquiry proceeded — an obvious nervous reaction. All in attendance, the court, the two Assistant District Attorneys, the court clerk, reporter, court officer and my law secretary and legal secretary, all noticed the odor which had been complained of — all except defense counsel, who, it was noticed, did not approach closer to the juror during the hearing than 10 or 15 feet.
Following the hearing, applying the statutory standard in CPL 270.35, the court found, "from facts unknown at the time of the selection of the jury,” that juror No. 12 was "grossly unqualified to serve” and further, had "engaged in misconduct of a substantial nature.” This action was necessitated when defense counsel would not agree to discharge the juror, obviously to preserve an issue for possible appeal, although he and defendant originally consented to the release of the juror if the People would agree to replace juror No. 8 with an alternate. Juror No. 8 had telephoned that morning that he was up all night with a cold, had a low-grade fever, and was waiting to contact his doctor in the afternoon. Inasmuch as, at that time, all that was known was that juror No. 8 could not come in that day, the District Attorney could not agree to release him since, at that moment, there was no legal basis to excuse juror No. 8.
Unquestionably, as the Court of Appeals observed in People v Buford (69 NY2d 290, 297-298), "A defendant has a constitutional right to a trial by a 'particular jury chosen according to law, in whose selection [the defendant] has had a voice’ (People v Ivery, 96 AD2d 712; People v West, 92 AD2d 620, 622 [Mahoney, P. J., dissenting], revd on dissenting opn below 62 NY2d 708; see, NY Const, art I, § 2).” (See also, People v Page, *925 72 NY2d 69, 73.) The operative standard, in terms of disqualifying a sworn juror as "grossly unqualified,” requires a determination whether the juror has a state of mind which would prevent the rendering of an impartial verdict (People v Rodriguez, 71 NY2d 214, 219; People v Buford, supra, at 298; People v West, supra, at 622). The statutory criterion imposes a greater burden upon the moving party than that where a juror is challenged for cause (People v Buford, supra; People v Ivery, 96 AD2d 712, supra).
And, as was recognized in People v Buford (supra, 69 NY2d, at 299), the determination must be made on a case-by-case basis, after a probing in camera inquiry by the court, with the attorneys permitted to participate if they so desire: "[E]ach case must be evaluated on its unique facts to determine whether a particular juror must be disqualified under CPL 270.35. In reaching its conclusion, the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Counsel should be permitted to participate if they desire. In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case. In this context, the court should carefully consider the juror’s answers and demeanor to ascertain whether her state of mind will affect her deliberations. The trial court’s reasons for its ruling should be placed on the record. In concluding that a juror is grossly unqualified, the court may not speculate as to possible partiality of the juror based on her equivocal responses. Instead, it must be convinced that the juror’s knowledge will prevent her from rendering an impartial verdict.”
In People v Westbrook (177 AD2d 677), the Appellate Division, Second Department, reversed and remanded the matter for a new trial, where the Trial Justice discharged a juror about whom a number of jurors had complained as having emitted a foul body odor. The Court found this to be error, since the juror was discharged without an inquiry or interview, as is required by both People v Page (supra) and People v Buford (supra).
Unlike the situation in Westbrook (supra), however, this court did conduct a searching inquiry of each juror and alternate, in camera, on the record, with all attorneys in attendance and participating. As a result, it was ascertained that a significant number of the jurors found it unbearable to remain in the same room with juror No. 12 and found his *926 constant talking and gestures not only annoying but also distracting to the point that, if it continued, it could interfere with their ability to concentrate on the testimony and proof as it was adduced at trial. Under the circumstances, especially bearing in mind the length of time these jurors were to be together in this protracted trial, the court took the only available and rational course in discharging juror No. 12 as "grossly unqualified.”
Furthermore, the validity of the complaints by the other jurors was fully sustained by the court’s in camera interview of juror No. 12. Although, initially, this was to be done in the courtroom, so that defendant could be present, when defendant and counsel waived defendant’s presence, the hearing was held in chambers. The interview confirmed the complaints of strange and abnormal behavior which could impinge upon the ability of the other jurors to concentrate.
The inquiry also confirmed the body odor, which was readily apparent to those present. Actually, this was conceded by defendant, who had agreed to discharge juror No. 12 if the People would consent to the release of juror No. 8. Inasmuch as juror No. 8 was only to be out that day, in accordance with information then available to the parties and the court, the People believed it would be improper to excuse juror No. 8 under those circumstances. Nevertheless, the prior consent to the release of juror No. 12 is in clear recognition that he was unqualified, a position from which defendant has now retreated in an obvious attempt to create an issue for possible appeal in the future.
Not without significance is the fact that subsequently, juror No. 8 was excused on consent as a result of his illness, which was more serious than originally believed. Thus, this fact and the discharge of juror No. 12 gave to defendant exactly what he consented to, namely, a jury which included the first two alternates. The composition of the jury was not changed since that time.
The Appellate Division holding in People v Westbrook (supra) impliedly recognizes that persistent foul body odor could amount to juror misconduct, sufficient to require disqualification under CPL 270.35. The reversal in that case resulted from the failure of the trial court to conduct any interview or inquiry, which, as noted, was done in this case.
Moreover, even assuming that foul body condition did not constitute "misconduct,” which it did, and did not render the *927 juror "grossly unqualified,” which he was in my view, under the circumstances of this case, the repeated talking out loud about the guilt or innocence of the defendant and the nervous slapping of the legs which accompanied it, amounted to misconduct, sufficient to disqualify him from further service (CPL 270.35).
By continuing in this fashion, in clear contravention of the court’s admonition not to talk out loud about the case, even to himself, juror No. 12 committed "misconduct of a substantial nature,” within the terms of the statute. His denial and refusal to recognize the problem showed that no corrective action was possible. His talking, which could be interpreted as an expression of doubt about the defendant’s guilt, if it persisted, could have far reaching and disastrous consequences as further evidence was adduced. Moreover, it was in direct violation of this court’s admonition not to speak out loud about the case. Plainly, the continued action by this juror demonstrated that he was incapable of following the most simple and basic instructions, given to safeguard and ensure defendant’s right to a fair trial (cf., People v Clarke, 168 AD2d 686, 687; see also, People v Berrios, 177 AD2d 493, 494).
Accordingly, applying the statutory standard, juror No. 12 should be disqualified from further service, either as "grossly unqualified” or for "misconduct of a substantial nature.” (CPL 270.35.) The interests of justice, the rights of the defendant, and the consideration and respect to be accorded the remaining jurors, who have served far in excess of the usual time for such service, demand no less. No reason appears why the court, the parties, the attorneys and the other jurors must continue to suffer by the presence of a juror who, on either ground, is unfit to proceed and should be disqualified.
Upon the foregoing, the motion to disqualify juror No. 12 is granted in all respects and the juror is disqualified pursuant to CPL 270.35, discharged and shall be replaced by the first alternate juror.